Hull, J.
This action comes into this court on a petition in error filed by the plaintiff in error who was plaintiff below, to reverse the judgment of the court of common pleas.
The action was brought by the plaintiff against the railroad company to recover damages for injuries which he claims he received on account of the negligence of the railroad company. The court, at the conclusion of the plaintiff’s testimony, upon motion of the defendant directed a verdict for the defendant, to which the plaintiff excepted, and thereafter judgment was entered upon the verdict in favor of the defendant.
The plaintiff claims in his petition that in the afternoon of the 22nd of January, 1899, between five and six o’clock, he was driving in his buggy along Main street in the village of Woodside in this county, and that he was struck by a freight train running over the defendant’s track as he crossed the tracks at Main street in said village, and he claims the negligence of the defendant was that no signal was given by the trainmen either by' whistling or ringing the bell as required by the statute; that his buggy was injured, and he suffered personal injuries for which he asks damages.
The answer of the defendant is substantially a general denial, and alleges by way of defense that the plaintiff wa* guilty of contributory negligence, and that whatever injury he suffered, if any, was caused by his own carelessness and *476 negligence. Rut one question is made in the case, and that is, the court erred in directing a verdict for the defendant at the close of the plaintiff’s testimony, so that the question here is rather a question of fact, to be decided however in the light of the law as it has been laid down by the courts, and especially by the supreme court of our own state.
The claim of the defendant is that the plaintiff was guilty of negligence in that he did not look and listen as he approached the railroad crossing, as he was required to do by the law of the land. The general rule of law governing such cases is well known and thoroughly established by the courts, and that is: that when one is approaching a known railroad crossing and in the full possession of bis faculties, he .is bound to look and listen for approaching trains unless the circumstances are such as would excuse a person of ordinary care and prudence from so looking, and listening. It has been held by the supreme court in this state many times, to be negligence as a matter of law to approach and cross á known railroad crossing without both looking and listening for approaching trains.
The consideration of this case involves an examination to some extent of the testimony, a brief examination of it so far as is necessary to determine whether the court erred in directing a verdict for the defendant. There is another rule of law, and that is, if the testimony is such that the minds of reasonable, men might differ as to whether a party had been guilty of negligence or not, then it is improper for the court to interfere, but the question should be submitted to the jury, and so when it is a question that reasonable minds might differ upon as to whether an ordinarily prudent man would be excused from looking and listening, that question should be submitted to the jury and should not be determined by the court.
If there are no circumstances which would excuse a person of ordinary care and prudence from looking and listening, then if it appears that he did not look and listen, if it was practicable to do so, his negligence becomes a matter of law under the authorities of this state.
The plaintiff, according to his own testimony, had been out some distance from the village of Woodside on this *477 Sunday, and along towards evening when it was growing perhaps a little dusk, reached the village of Woodside. There is an allegation in the petition which might be material, that the headlight on the engine was not of sufficient strength to.throw a light as far ahead as it should have been thrown, but nothing seems to have been made of this on the trial of the case, nor here. That there was a headlight on the engine does not seem to be disputed, and it was light enought at this time to see a train of cars without a light, for a number of witnesses were called who were about there, and no one testified that it had grown so dark but that a train of cars could be seen readily.
Plaintiff had been out in the afternoon looking after his oil wells, and was returning home. He was thoroughly familiar with this crossing, as his own testimony shows. He had crossed it for a year prior to the accident every day or every alternate day, and was thoroughly aware of the fact that he was approaching a railroad crossing. There is an allegation in the petition that there was no warning sign at this crossing, but nothing seems to have been made of that, and that would not be material in any event, as plaintiff was fully aware of the fact that he was approaching this crossing.
It was about five o’clock, he came from the west and was therefore driving east, and the train which struck him came from the north. He was driving along the main street of the village of Woodside upon which there were some houses, and some photographs were introduced in evidence to show that. The houses were not built closely together, but were some distance apart. There was also a store on this street about two hundred and fifty feet from the railroad crossing, and plaintiff was asked this question: “State whether you stopped along that street anywhere;” and he answered that he did about two hundred and fifty feet from the crossing, He says he stopped for the purpose of fixing a tug on his harness that had become unfastened. Somewhere in the record it is shown that he stopped about in front of the store. After he had repaired his harness he got into the buggy and drove across the track. He' was asked to state what he did at the time he got out of the buggy, and he says: “I listened, but I did not *478 hear any train, but I could not see anything on account of them houses; I looked so far as I could see.” That is to say, he could not see, where he was at that time, two hundred and fifty feet from the track, on account of these houses. He could not see the train if he was looking, with a house between him and the railroad track. The photographs show that there was a considerable space between the houses. The undisputed testimony discloses that for a distance of one hundred and eighty five feet there were no houses; between the last house and the railroad crossing it was one hundred and eighty-five feet'; there was in this space a stave shed about eighteen feet wide and a hundred and thirty feet long and it had at that time at the end toward the crossing about a carload of staves that obscured the view for a very short distance, that is, the staves did; the stave shed was entirely open from the ground to the roof, leaving a space to see the cars through.
The plaintiff testified: “I drove on towards the track, and as my horse came close to the track, of course, I seen the engine,and my horse commenced jumping, and I could not hold him, and he went up and down, and my buggy got struck by the engine.
“Q, How long a time was it from the time your horse got scared until you were injured? A. I don’t know. Not any time at all.
Now,it will be observed by this testimony of the plaintiff in the examination in chief, he is asked: “State what you did at the time you got out of the buggy, and at any time up to the time you crossed the railroad track?” And he says “I listened,but I could not hear any train, but I could not see anything on account of them houses. I looked so far as I could see. ” So it would appear from his answer that he did not look after he had got beyond the houses, for he says he could not see anything on account of the houses. On his cross-examination h.e testifies that he was familiar with this crossing, and that he had crossed it every day or so, and on page seven of the record he is asked this: “Q. You stopped and got out of the buggy to fix this tug about two hundred and fifty feet west of the crossing? A. Just about.
“Q. And when you were two hundred and fifty feet west, *479 of the crossing, the houses down on these lots were in your way so you could not see? A; I can not say that,.
'‘Q. And you looked as far as you could through those houses, and then you got in your buggy and drove on, supposing there was nothing coming? A. My horse, as I got in the buggy — -my horse went on a trot about four or five miles an hour, and as I passed on I looked,
“Q. You trotted up to the crossing on a slow trot? A. Yes, four or five miles an hour. As I got about — well-past the store, I looked out the buggy and I did not see no train, It was getting dusk and it was cloudy, and as I drove on towards the track, you know, I don’t know how many feet I was, there came the train, and then my horse commenced jumping and getting scared with the steam, and I could not hold him.’’ He says his horse was not a spirited horse.
“Q. Where you stopped was in front of the store? A. A little bit further back to the west.
“Q. Then when you got in your buggy,your horse started without your telling him to start, and you went on a trot of four or five miles an hour right along? A. Yes, I started the horse up again when I got in the buggy.”
He was riding in a top buggy with curtains on the sides, and, as appears fmm his testimony, after he got in the buggy his horse started on a trot at the rate of four or five miles an hour.
This testimony is susceptible of an interpretation and construction that he did not look after he got beyond the last house.
One or two of his answers would indicate that he might have done so, but his testimony on that point is somewhat indefinite; but it would be fair to conclude that he meant to have it understood that after he got out from behind the houses he looked and did not see the train. There is another principle of law which has been laid down by our supreme court, and that is, that although a party testifies that he looked and listened, if the circumstances are such that by looking and listening in the exercise of ordinary care he must have séen and heard an approaching train, he will be held guilty of negligence as a matter of law, notwithstanding his testimony, that he looked and listened.
*480 It does not avail a man to testify that be looked and listened for an approaching train when it is clear that if be had looked and listened and exercised ordinary care he must have seen the train or heard it approaching, and if the undisputed facts show that if a party had looked and listened with ordinary care he must have become aware of the approaching train,it will be held that if he did look and listen, he did it so negligently that he himself was guilty of contributory negligence,and therefore cannot recover.
A witness by the name of Marks, an engineer of the railroad company, was put upon the stand by the plaintiff to testify to a plat offered in evidence, and he testified that he made the plat and the accompanying measurements correctly, and on cross-examination was asked some questions in regard to the distances that one might see up the track to the north while approaching it on Main street as the plaintiff was at the time of the accident, and these distances are indicated on the plat by figures and red lines. It is best to read from his testimony so as to get it exactly as the witness testifies.
‘‘Q. You took all the measurements? A. Yes, sir.
”Q. Do these figures on the dotted red lines indicate the distances of the point of view from the crossing? A. Yes, sir.
“Q. This further point of view west of the crossing is 135 feet, is it? A. Yes, sir.
“Q. And the next one as you approach, is 160 feet? A. Yes, sir.
‘‘Q. And the next one is 52 feet? A. Yes, sir.
‘‘Q. And the next one is 36 feet? A. Yes, sir.
“Q. And the next one is 25 feet? A Yes, sir,
“Q. Now,the red line which is drawn from the point 185 feet west of the crossing northward passes in front of all buildings, does it not? A. Yes, sir.
”Q. It is west of the stave shed and stock pens? A. Yes, sir.
‘‘Q. But it passes between all of the houses and the railroad track, does it not? A. Yes, sir.
‘‘Q. Take the next point of view, which is 65 feet west of the crossing,and you can see down the track from that point north, how far? A. You can see to a point two thousand feet.”
*481 So that at one hundred and eighty five feet from the crossing the plat shows you can see down the track eight hundred aud twenty feet. At sixty-five feet from the crossing,according to the undisputed testimony in the case (this testimony was not contradicted or disputed by anyone), you can see down the track nearly a half mile. There were no bouses between that point aud the railroad track. There was a fence, but it wa-t not of such a height as to obstruct the view of one sitting in a buggy.
This question was asked then:
“Q. You can see down the track' then 2000 feet? A. Yes, sir.
“Q. And that line passes in front of all the houses, does it not? A. Yes, sir.
“Q. So that there is absolutely nothing to obstruct the view along that line? A. Nothing.
“Q. Neither is there anything to obstruct the view on the first line commencing 185 feet from the crossing? A. No, sir”.
Then this question was asked:
“Q. Now we will come down to the point 52 feet from the crossing, and is it not true that you can see from that point two miles down the railroad track ? A. It is true with the exception of the staves that are now piled there.
“Q. I am not asking you about now. From that point you can see down the track two miles? A. Yes, sir.
*'Q. With absolutely nothing to obstruct the view? A. Nothing.
‘‘Q. It clears the stave shed on the west? A. Yes, sir.
“Q. And about the stock pens — where the line crosses the stock pens is an ordinary fence? A. Yes, sir.
“Q. About the same height of the fence along the right of way ? A. Yes, sir.
“Q. So that you can look over the top of it if you were merely standing there? A. Yes, sir.
“Q. And from a buggy you could see clear over? A. Yes, sir.
“Q. Now,coming to the point of view 36 feet west of the crossing,is it not true that you could see 282 feet down the railroad track without any obstruction? A. Yes, sir.
“Q. That line passes east of the stock pens and east of the stave shed? A. Yes, sir.
*482 “Q. So that there is absolutely nothing in the way for 282 feet down the railroad track? A. Yes, sir.
“Q. And when you get on the side track which is still 25 feet away from the crossing, you can see without any obstruction clear down two miles north? A. The side track is not 25 feet away,but when you get 25 feet away from the center of the crossing of the main track you can see down the track two miles. It is not immediately on the side track, but to the west of the side track.
“Q. Just west of the side track you can see two miles?
A. íes, sir.
“Q. And you can see free of all buildings, sheds and everything? A. Yes, sir.
“Q. Now state, if it is not true that a man walking aloDg here on foot can see the smoke stack of the engine if he were looking and the engine were coming, over the top of that shed? A. Yes, I believe he could.
“Q. And riding in a buggy,is there any doubt about his being able to see the smokestack of the engine over the top of that shed? A. No, sir, not to my mind.”
On page 12 this question is asked him: “I thought you did not understand me. So that it is true from the point 185 feet west of the crossing up to the crossing,there is only a space of about ten feet where a man could not see an engine coming down the track if he were looking ?” And he answered “I think that is the fact of the case.”
This then, was the uncontradicted testimony as to the conditions surrounding that crossing and the ability of a person to see a train as it approached from the north, as he approached the crossing from the west as the plaintiff did. So that it appears from this testimony that for the full distance of one hundred and eighty five feet there was an unobstructed view of this track for the distance of 820 feet,a distance far enough to enable one to see a train and stop with safety. Now, it was not dark at this time. The freight train was running at an ordinary rate of speed; it is not claimed that it was going faster than freight trains usually do; probably going twelve or fifteen miles an hour. It was making the noise that trains of that character usually make. It vi as beard by many people,some of whom were called as witnesses by the plaintiff. There were some witnesses who lived and were in *483 theviciaity of this crossing; called as witnesses to testify in regard to the signals. They testify they did not hear the signals given. Several testify that the signals were not given. The plaintiff testified he neither saw nor heard the train. These nine witnesses to whom I have referred all heard the train. Some of them saw it. Some of them were in the houses around and about, and heard this train. Another was in his house lying on a lounge and heard the train as it went by. His wife and daughter also heard it. So that all the people near that crossing who were called by the plaintiff, nine in number, heard this train as it approached the crossing, and testified they did not hear any signals given. The plaintiff,according to his own testimony, was going along in a top buggy with the curtains down. He was not in a position to hear an approaching train,perhaps, with himself surrounded by the top of the buggy and curtains. He was trotting along at a four or five mile gait. So far as the evidence shows, he did not slacken the speed of his horse until his buggy was finally struck by the train.
Can it be held that the plaintiff might have looked and listened for this approaching train and not see or hear it? He bad this full one hundred and eighty five feet to look for the train. At sixty five feet from the crossing he could see down the track two thousand feet, and at a hundred and eighty five feet he could see eight hundred and twenty feet. Twenty five feet from the crossing be could see two miles, and with this unobstructed view he testified that he did not see the train, and although all these persons who were called by him as witnesses testified they heard the train, he testified that he did not hear it.
It seems to us from this testimony, that this plaintiff, as a matter of law, must be held to have been guilty of contributory negligence; that if he looked he must have seen the train, or if he had listened with ordinary care he must have heard it. He had abundant opportunity to see it and hear it, and therefore, if he did look and listen, -and did not see it or hear it, he must have looked and listened in a manner so negligent as to be guiltyof contributory negligence. If he did not look and listen,then he was clearly guilty, under’ the law, of negligence, and can not recover. ■■
The cases in which this doctrine is laid down are so fam *484 iliar and well known to the profession ibat it is hardly worth while to cite them. In connection with this testimony two or three cases may be referred to however which are in point. One is the case of the Cleveland, Columbus, & Cincinnati Railroad Company v.Crawford, Administrator, 24 Ohio St., page 631, the first paragraph of the syllabus of which reads as follows:
“Ordinary prudence requires that a person in the full enjoyment of the faculties of hearing and seeing, before attempting to pass over a kuown railroad crossing, should use them for the purpose of discovering and avoiding danger from an approaching train; and the omission to do so, without a reasonable excuse therefor, is negligence, and will defeat an action by such person for an injury to which such negligence contributed. ’’
It might be excused if the circumstances were such that it would be reasonably excusable not to look and listen; the supreme couit say that might excuse his failure to look and listen; but in this case there is absolutely nothing to excuse the plaintiff from looking and listening. He knew he was approaching a railroad crossing; be was perfectly familiar with it and thought of it, and at the time he had an unobstructed view for one hundred and eighty five feet from the crossing.
There appears to be absolutely nothing to excuse him from complying with the Tule laid down by this case and the other authorities in this state.
In the case of the C. C. C. & I. R. R. Co. v. Elliott, 28 Ohio St. page 340, the,second paragraph of the syllabus reads:
“The omission to ring the bell or sound the whistle at public crossings is not of itself sufficient ground to authorize a recovery, if the party, notwithstanding such omission, might, bv the exercise of ordinary care, have avoided the accident.”
And the last paragraph of the syllabus reads:
”It is the duty of a traveller upon the highway,when approaching a railroad crossing, to make use of his senses to ascertain if there is a train in the vicinity; and if, when in full possession of his faculties, be fails to see or hear anything, when a prudent man, exercising his eyes and ears *485 with ordinary care, would have discovered a train in close proximity, and he is thereby injured, he is guilty of such negligence as will prevent a recovery.”
The language of that paragraph of the syllabus will be noticed:
‘‘If, when in full possession of his faculties, be fails to see or hear anything, when a prudent man, exercising his eyes and ears with ordinary care,would have discovered a train in close proximity, and he is thereby injured, he is guilty of negligence.” Although, he says, he did look and listen.
In the case of the Pennsylvania Co. v. Rathgeb in 32 Ohio St. page 66, this rule is laid down again, and the supreme court say on page 72 of its opinion:
*‘ We think the Jaw must now be considered as well settled, that the traveler approaching a crossing must be upon the lookout for danger. Ordinary care requires that he must look and listen to see if a train is in the vicinity, and if he fails in this, it is not merely evidence of negligence to be considered by the jury, it is itself such negligence as will prevent a recovery.”
And on page 73 in the opinion, the court say:
‘‘Being able to see therefore, and the opportunity of seeing being presented, bis failure to discover or to be aware of the approaching cars, we think, was not only evidence of negligence, but negligence itself, and sufficient to justify a verdict against him,”
To hold that the plaintiff in this case was entitled to have this question submitted to the jury under the undisputed facts, it seems to us would be to hold directly contrary to the law as laid down by the supreme court in this state.
The court, in our judgment, under this testimony, was required by the law to do exactly what was done; i. e. direct a verdict for the defendant.
The evidence was clear and undisputed that the plaintiff might have seen this train in time to avoid injury.
The fact that he testified he looked from time to time as he does testify in rather an indefinite way,is not sufficient under the law of this state to require a submission of the question to the juvy. The evidence is uncontroverted and dear that he had abundant opportunity to see and hear this train, If he *486 had looked with proper care he must have seen it, or, if he had listened, he must have heard it,and the conclusion, as a matter of law is, that he either did not look or listen and therefore can not recover, or, if he did look and listen, he was so careless and negligent that he must be deemed guilty of negligence as a matter of law.
James & Beverstoek, for Plaintiff.
James 0. Troup, for Defendant.
For these reasons the judgment of the court of common pleas will be affirmed.